1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   RICKY HAMMONDS,                          No. CIV S-06-2397-CMK-P

12              Plaintiff,

13        vs.                                 <u>MEMORANDUM OPINION AND ORDER</u>

14   M. MARTEL, et al.,

15              Defendants.

16   _____/

17              Plaintiff, a state prisoner proceeding pro se, brings this civil rights action pursuant

18   to 42 U.S.C. § 1983.   Pursuant to the consent of the parties, this matter is before the undersigned

19   for all purposes.  Pending before the court are:  (1) plaintiff's motion for summary judgment

20   (Doc. 34); and (2) defendants' cross-motion for summary judgment (Doc. 39).

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

# I. BACKGROUND

Plaintiff names as defendants Martel, Malfi, Dunlap, Vance, Vasquez, Grannis, Vanderstein, and Kim.[1]  Plaintiff alleges that, in August 2005, his custody status was reviewed by a prison committee and that his custody status was changed to "E.O.P.," which plaintiff describes as "mentally ill out-patient custody."  According to plaintiff, this change in custody status was based on a psychological evaluation performed by prison medical clinicians.  Plaintiff states that prison staff ". . . specifically told the mental health staff that they were loosing [sic] money due to their evaluation as to my mental state of mind when housed with cell mates."  Plaintiff adds: "So, to give merit to their evaluation, clinical psychologists made me E.O.P. and sent me to C.S.P. Sacramento to the psychiatric [secured housing unit] where I was again single-celled for 7 months."  As to the defendants named in this action, plaintiff states: "The defendants in this petition acted on 4-17-06 to remove me from single cell status without reading the enclosed exhibits in this suit."  According to plaintiff, the "enclosed exhibits" show that his mental disease is "a factor," presumably in the classification determination, and that he has a history of violent behavior ". . . when stressed and during confrontationary [sic] situations." .

After reciting difficulties with presenting grievances concerning his removal from single-cell status, plaintiff states: "I have had 5 different cell mates. . . In cell fights.  Period on 2 occasions where I've been without a cell mate for weeks.  So, the relief I request is as follows: Due to denial of medical care – deliberate indifference, because defendants in this matter deliberately ignored all relevant paperwork, and my fears that I related to clinicians & doctors and by overtly threatening me by saying they were loosing [sic] money and needed the bed space."  Plaintiff alleges: "I am placed in the position of, keep getting cell mates and keep getting into violent confrontations where I've been hurt, whereby if I report them, I will be labled [sic] and targeted for retaliation for snitching. . ."

---

[1]     Defendants Malfi and Grannis have been dismissed.

1    Plaintiff claims that ". . . the defendants have ignored all relevant documents, have

2    not given petitioner further evaluations at Level 1 and Level 2 responses to even try to find out if

3    petitioner is mentally fit to double cell."   He states that defendants Martel, Dunlap, and Vance

4    "were all involved in the decision to double-cell petitioner, disregarding relevant

5    documentation."  Plaintiff alleges that defendant Vasquez "offered no relevant documentation to

6    validify [sic] committee's [custody] decision."  As to defendant Vanderostyne – who was

7    plaintiff's clinician – plaintiff states that she "made no chrono available to the doctor (Vasquez)

8    or committee even though, weekly, I voiced my weekly problems of cell fights and paranoia as to

9    my cell mates I started getting once I was certified to double cell."  Plaintiff claims that

10   defendant Kim "stated that he and other doctors were no longer allowed to write chronos for

11   inmates who fit criteria for single celled."

12   The gravamen of plaintiff's complaint is that defendants were deliberately

13   indifferent to risks to his safety posed by being housed with a cell mate.  Specifically, plaintiff

14   claims that defendants ignored available documentation of his mental illness and the need to be

15   housed alone due to his inability to cope with cell mates.  For relief, plaintiff seeks an order

16   directing defendants to place him back on single-cell status, as well as money damages for

17   "physical and emotional injuries."

18   In support of their motion, defendants submit the declarations of defendants

19   Vanderostyne, Kim, Martel, and Vasquez.  Also submitted with defendants' motion are notes

20   from classification committee meetings held in February and April 2006.  According to

21   defendants, this evidence demonstrates that the following facts are undisputed:

22   1.   At the February 2006 classification committee meeting it was noted that,
          since his arrival at California State Prison – Sacramento, plaintiff had
23        positive programming, including attending group therapy and meetings
          with his mental health counselor and doctor and that plaintiff did not pose
24        a threat to the safety and security of the institution;

25   2.   The February 2006 classification committee continued plaintiff on single-
          cell status pending re-evaluation in 60 days;

26

3.   Plaintiff agreed with the February 2006 classification committee action;

4.   No defendants were members of the February 2006 classification committee;

5.   Defendants Martel, Dunlap, Vance, and Vasquez were members of the April 2006 classification committee;

6.   Defendant Vanderostyne was plaintiff's mental health case manager;

7.   Defendant Kim was plaintiff's treating psychologist;

8.   The April 2006 classification committee noted that, in the previous six years, plaintiff had only one incident of in-cell violence in November 2000;

9.   The April 2006 classification committee concluded that plaintiff no longer met single-cell status criteria based on review of his case factors, including his mental health and disciplinary history;

10.   The April 2006 classification committee concluded that plaintiff could safely cell with a compatible inmate, which plaintiff would be allowed time to find;

11.   As of the April 2006 classification committee meeting, plaintiff never demonstrated suicidal or violent ideation at the mention of double-cell status, and never demonstrated such ideation or tendencies after being placed on double-cell status;

12.   Plaintiff admits that he only reported incidents of fights with cellmates after being placed on double-cell status;

13.   Defendant Vanderostyne was unable to confirm plaintiff's accounts of in-cell violence because he did not display any outward signs of violence;

14.   Plaintiff had no case factors that indicated he could not maintain self-control; and

15.   In mental health sessions, plaintiff indicated that he believe double-celling would lead to confrontation with a cellmate.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

1   must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

2   of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986);

3   <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987), and

4   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

5   for the nonmoving party, <u>Wool v. Tandem Computers, Inc.</u>, 818 F.2d 1433, 1436 (9th Cir. 1987).

6          In the endeavor to establish the existence of a factual dispute, the opposing party

7   need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

8   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

9   versions of the truth at trial." <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the "purpose of summary

10  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

11  genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

12  committee's note on 1963 amendments).

13         In resolving the summary judgment motion, the court examines the pleadings,

14  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

15  any.  <u>See</u> Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  <u>See</u>

16  <u>Anderson</u>, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed

17  before the court must be drawn in favor of the opposing party.  <u>See</u> <u>Matsushita</u>, 475 U.S. at 587.

18  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

19  produce a factual predicate from which the inference may be drawn.  <u>See</u> <u>Richards v. Nielsen</u>

20  <u>Freight Lines</u>, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th Cir.

21  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

22  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

23  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

24  'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

25  / / /

26

### III. DISCUSSION

Plaintiff argues that he is entitled to judgment as a matter of law on his claims for damages.[2] Defendants argue that plaintiff's motion should be denied and that judgment should be entered in their favor as a matter of law because plaintiff cannot establish the essential elements of his Eighth Amendment claim. Specifically, defendants argue: (1) plaintiff was never at a substantial risk of serious harm; and (2) defendants had no knowledge that placing plaintiff on double-cell status could result in a risk of harm and, therefore, did not knowingly disregard any risk. Defendants also argue that they are entitled to qualified immunity.

### A.  Elements of Eighth Amendment Claim

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994). The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986). A prison official violates the Eighth Amendment only when two requirements are met: (1) objectively, the official's act or omission must be so serious such that it results in the denial of the minimal civilized measure of life's necessities; and (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison official must have a "sufficiently culpable mind."  See id.

/ / /

---

[2]    Plaintiff admits that his claims for injunctive relief are now moot because he has been returned to single-cell status.

1    Under these principles, prison officials have a duty to take reasonable steps to

2 protect inmates from physical abuse.  See Hoptowit v. Ray, 682 F.2d 1237, 1250-51 (9th Cir.

3 1982); Farmer, 511 U.S. at 833.  Liability exists only when two requirements are met:  (1)

4 objectively, the prisoner was incarcerated under conditions presenting a substantial risk of

5 serious harm; and (2) subjectively, prison officials knew of and disregarded the risk.  See Farmer,

6 511 U.S. at 837.  The very obviousness of the risk may suffice to establish the knowledge

7 element.  See Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).  Prison officials are not

8 liable, however, if evidence is presented that they lacked knowledge of a safety risk.  See Farmer,

9 511 U.S. at 844.  The knowledge element does not require that the plaintiff prove that prison

10 officials know for a certainty that the inmate's safety is in danger, but it requires proof of more

11 than a mere suspicion of danger.  See  Berg v. Kincheloe, 794 F.2d 457, 459 (9th Cir. 1986).

12 Finally, the plaintiff must show that prison officials disregarded a risk.  Thus, where prison

13 officials actually knew of a substantial risk, they are not liable if they took reasonable steps to

14 respond to the risk, even if harm ultimately was not averted.  See Farmer, 511 U.S. at 844.

15    As indicated above, defendants argue that plaintiff cannot establish either the

16 objective component (that a substantial safety risk existed) or the subjective component (that they

17 knew about and disregarded such a risk).

18    1.    Objective Component – Existence of a Substantial Risk

19    Eighth Amendment safety cases require the plaintiff to establish as the objective

20 component that there was a substantial risk of harm.  In the context of the facts of this case,

21 plaintiff must prove that he was at substantial risk of harm from being double-celled.  Defendants

22 argue:

23    As of the April 17, 2006, classification committee, mental health
     records indicated that although Hammonds did not want to be double-
24   celled, he never demonstrated suicidal or homicidal ideation when the
     issue of double-celling was raised.  Even after Hammonds was assigned
25   double-cell status, Hammonds never complained he was feeling suicidal or
     homicidal.  Instead, Hammonds expressed nothing more than the fact that
26   he did not want to share a cell with another inmate and generalized

1   opinion that he believed he was incapable of sharing a cell because he was
    paranoid and would act out physically against his cellmate, causing an in-
2   cell fight.  This was nothing more than generalized complaints about his
    safety concern and did not present any solid evidence of an identifiable
3   serious risk to Hammonds' safety.

4          According to defendants, the undisputed facts do not establish a serious risk from

5   double-celling.  In February 2006, the classification committee noted that, since arriving at

6   California State Prison – Sacramento, plaintiff had attended group therapy meetings with his

7   mental health counselor and doctor and that plaintiff did not pose a threat to the security of the

8   institution.  When the February 2006 classification committee stated that plaintiff's single-status

9   would be re-evaluated in 60 days, plaintiff did not object.  When the classification committee

10  considered plaintiff's situation again in April 2006, the committee noted that plaintiff's only

11  incident of in-cell violence in the past six years occurred in November 2000.  Further, as of April

12  2006, plaintiff never demonstrated any suicidal or homicidal ideation at the mention of double-

13  cell status.  Based on this history and plaintiff's positive mental health treatment, the April 2006

14  committee concluded that plaintiff could be double-celled safely with a compatible inmate,

15  which plaintiff was provided time to find.  Defendants Vanderostyne and Kim, who provided

16  mental health care to plaintiff, followed plaintiff's treatment and noted that plaintiff never

17  exhibited any sign that he would act out against a cellmate.  Additionally, defendant

18  Vanderostyne was unable to confirm plaintiff's reports of in-cell fights because he never

19  exhibited outward signs of violence.

20          However, the court does not agree that there is no evidence to support the

21  conclusion that double-celling posed a substantial risk to plaintiff's safety due to his mental

22  condition.  In particular, the court acknowledges that plaintiff was involved in an incident of in-

23  cell violence with a cellmate in November 2000, as evidenced by a report from plaintiff's central

24  file provided with his opposition.  While this report does not indicate the cause of the incident, it

25  is possible that a jury could conclude that the incident was the result of plaintiff's inability to get

26  along with a cellmate due to his mental condition.  Therefore, the court cannot discount this

1    document.

2             To the extent defendants argue that the 2000 incident is not relevant because of

3    the passage of six years during which plaintiff participated in mental health treatment, the court

4    takes note of a document attached to plaintiff's opposition relating to a March 28, 2004, incident

5    in which plaintiff assaulted a "P.O."  The mental health clinician indicated he believed plaintiff's

6    mental disorder contributed to the incident and that plaintiff's disorder should be considered

7    when assessing a penalty.  The clinician also reported that plaintiff  had "possible assaultive

8    tendencies."  As with the November 2000 incident, a jury could conclude that this 2004

9    assessment of assaultive tendencies supports plaintiff's assertion of the existence of a substantial

10   risk from double-celling.

11            Additionally, plaintiff attaches to his opposition a "Physician's Order and

12   Medication" form dated January 12, 2004, in which a doctor stated:  "Single cell status needed."

13   Plaintiff also provides notes from the June 2001 and April 2002 classification committee

14   meetings.  The June 2001 classification committee stated:

15            Committee acts to place [plaintiff] on single cell status based on violence
             towards cellmate as noted in C-file. . . .[Plaintiff] indicated that he would
16           react toward any inmate put into his cell in a violent manner. . . .

17   Similarly, the April 2002 committee concluded:

18            Committee acts to retain [plaintiff] on single cell status . . . .  [Plaintiff]
             does have a substantial history of being assaultive to cell mates.
19

20   Again, along with the other documents discussed above, a jury could find based on the doctor's

21   orders in January 2004 and the classification committee recommendation in June 2001 and April

22   2002 that plaintiff's mental health problems precluded him from safely double-celling.

23            The court finds that there is evidence on both sides of the issue of whether double-

24   celling posed a substantial risk of danger to plaintiff's safety due to plaintiff's mental health

25   problems and/or past history of violence in general and towards prior cellmates in particular.

26   Specifically, the documents provided by plaintiff and discussed above, tend to undercut some of

1   defendants' statements of fact.  For example, defendant Vanderostyne stated that plaintiff never

2   reported any fights with cellmates to custody staff and that he did not observe any "outward signs

3   that Mr. Hammonds had been involved in a fight of any sort."  However, plaintiff must have

4   reported fights with cellmates to custody staff for references to in-cell violence to appear in

5   classification committee notes.  Additionally, while defendant Vanderostyne may have never

6   personally observed "outward signs" that plaintiff had been involved in fights, the evidence

7   reflects that he was involved in several such incidents, at least some of which were with

8   cellmates.  Therefore, defendants are not entitled to summary judgment based on their argument

9   that plaintiff 's case suffers a failure of proof on the necessary element of substantial risk to

10  plaintiff's safety.

11                   2.   Subjective Component – Knowing Disregard of a Substantial Risk

12                  Assuming that plaintiff may be able to prove to a jury that his history of violence

13  towards cellmates establishes the existence of a substantial risk from double-celling, the court

14  next turns to defendants' argument that, subjectively, they neither knew of such risk nor

15  disregarded it.  Defendants Martel, Dunlap, Vance, and Vasquez were members of the April

16  2006 classification committee and, as such, reviewed "all of Hammonds' case factors," including

17  his mental health and disciplinary history.  As discussed above, there is evidence of violence in

18  November 2000 and March 2004.  Additionally, there is evidence that the June 2001 and April

19  2002 classification committees recommended single-cell status due to plaintiff's in-cell violence

20  on cellmates.  There is also evidence that, in January 2004, a doctor ordered single cell status.

21  Given that defendants state that the members of the April 2006 committee reviewed all case

22  factors, including mental health and disciplinary records, a jury could conclude that they also

23  reviewed this evidence and therefore knew of a risk to plaintiff's safety posed by double-celling.

24  / / /

25  / / /

26  / / /

11

1       As to the remaining two defendants – Vanderostyne and Kim – they indicate that

2   they were plaintiff's mental health care providers and that they followed plaintiff's case.

3   Defendant Vanderostyne states that plaintiff reported instances of in-cell violence to him and

4   expressed his belief that he would act out against cellmates.  A jury could conclude based on this

5   that defendant Vanderostyne knew (or should have known) that double-celling represented a risk

6   to plaintiff.  As for defendant Kim, as plaintiff's treating psychologist, he would have reviewed

7   plaintiff's medical records and noted the January 2004 doctor's order for single-cell status.  In his

8   declaration, defendant Kim states that "at no time did Mr. Hammonds exhibit any sign that he

9   would be a danger to himself or others, if he were double celled."  This statement is vague,

10  however, as to what defendant Kim means by "exhibit any sign."  The evidence suggests that

11  plaintiff was involved in incidents of in-cell violence.  The evidence also reflects that there was

12  reason for a doctor to order single-cell status in January 2004.  A jury could conclude that these

13  are signs that plaintiff double-celling would be risky and that, as plaintiff's treating doctor,

14  defendant Kim knew (or should have known) about these "signs."

15      Assuming that plaintiff may be able to establish that defendants knew of a

16  substantial safety risk posed by double-celling, the next question is whether defendants

17  disregarded that known risk.  As stated above, prison officials cannot be said to have disregarded

18  a risk if they took steps to avoid the danger, even if they are unsuccessful.  In this case,

19  defendants state that all of plaintiff's case factors were considered, including his history of

20  mental problems and violence, in reaching the determination in April 2006 that plaintiff could

21  safely double-cell.  One of the factors considered was that plaintiff had been participating in

22  group therapy and other mental health treatment.  And, most notably, it is undisputed that the

23  April 2006 classification committee stated that plaintiff would only be double-celled with a

24  compatible inmate, and plaintiff was provided time to seek such an inmate.  By taking steps to

25  ensure that plaintiff was housed with only a compatible inmate of his choice, it cannot be said

26  that they disregarded any risk associated with double-celling.  Therefore, even if plaintiff can

1    prove at trial that defendants knew of a substantial risk to his safety, plaintiff cannot establish

2    that defendants acted with a sufficiently culpable mind.

3    **B.    Qualified Immunity**

4            Government officials enjoy qualified immunity from civil damages unless their

5    conduct violates "clearly established statutory or constitutional rights of which a reasonable

6    person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In general,

7    qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

8    law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  In ruling upon the issue of qualified

9    immunity, the initial inquiry is whether, taken in the light most favorable to the party asserting

10   the injury, the facts alleged show the defendant's conduct violated a constitutional right.  See

11   Saucier v. Katz, 533 U.S. 194, 201 (2001).  If, and only if, a violation can be made out, the next

12   step is to ask whether the right was clearly established.  See id.  This inquiry "must be undertaken

13   in light of the specific context of the case, not as a broad general proposition . . . ."  Id.  "[T]he

14   right the official is alleged to have violated must have been 'clearly established' in a more

15   particularized, and hence more relevant, sense:  The contours of the right must be sufficiently

16   clear that a reasonable official would understand that what he is doing violates that right." Id. at

17   202 (citation omitted).  Thus, the final step in the analysis is to determine whether a reasonable

18   officer in similar circumstances would have thought his conduct violated the alleged right.  See

19   id. at 205.

20           When identifying the right allegedly violated, the court must define the right more

21   narrowly than the constitutional provision guaranteeing the right, but more broadly than the

22   factual circumstances surrounding the alleged violation.  See Kelly v. Borg, 60 F.3d 664, 667

23   (9th Cir. 1995).  For a right to be clearly established, "[t]he contours of the right must be

24   sufficiently clear that a reasonable official would understand [that] what [the official] is doing

25   violates the right."  See Anderson v. Creighton, 483 U.S. 635, 640 (1987).  Ordinarily, once the

26   court concludes that a right was clearly established, an officer is not entitled to qualified

13

1   immunity because a reasonably competent public official is charged with knowing the law

2   governing his conduct.  See Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  However, even

3   if the plaintiff has alleged a violation of a clearly established right, the government official is

4   entitled to qualified immunity if he could have ". . . reasonably but mistakenly believed that

5   his . . . conduct did not violate the right." Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th

6   Cir. 2001); see also Saucier, 533 U.S. at 205.

7          The first two steps in the qualified immunity analysis involve purely legal

8   questions.  See Trevino v. Gates, 99 F.3d 911, 917 (9th Cir. 1996).  The third inquiry involves a

9   legal determination based on a prior factual finding as to the government official's conduct.  See

10  Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995).  In resolving these issues, the court must

11  view the evidence in the light most favorable to plaintiff and resolve all material factual disputes

12  in favor of plaintiff.  Martinez v. Stanford, 323 F.3d 1178, 1184 (9th Cir. 2003).

13          In this case, the court finds that the right at issue is clearly established.  However,

14  as discussed above, defendants' conduct did not violate plaintiff's Eighth Amendment right to

15  safety because, by taking steps to avoid any risk associated with double-celling, it cannot be said

16  that defendants disregarded any known risk.  For this reason the qualified immunity analysis

17  favors defendants.  Assuming, however, that a violation can be made out, the court will consider

18  whether defendants could have reasonably believed their conduct did not violate the Eighth

19  Amendment.  Again, in light of the reasonable steps taken to avoid any risk associated with

20  double-celling, the court concludes that this question favors a finding of qualified immunity.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**IV.  CONCLUSION**

Accordingly, IT IS HEREBY ordered that:

1.      Plaintiff's motion for summary judgment (Doc. 34) is denied;

2.      Defendants' cross-motion for summary judgment (Doc. 39) is granted; and

3.      The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff and close this file.


 DATED:  October 8, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE